LEED ARCHITECTURAL PRODUCTS, INC., Plaintiff–Appellant,

v.

UNITED STEELWORKERS OF AMERICA, LOCAL 6674, and United Steelworkers of America, AFL–CIO, CLC, Defendants–Appellees.

No. 1307, Docket 90–7095.

United States Court of Appeals, Second Circuit.

Argued May 25, 1990.

Decided Oct. 12, 1990.

Alan I. Scheer, Hartford, Conn. (Karen P. Blado, Robert M. DeCrescenzo, Updike, Kelly & Spellacy, P.C., Hartford, Conn., of counsel), for plaintiff-appellant.

Rudolph L. Milasich, Jr., Asst. Gen. Counsel, United Steelworkers of America, Pittsburgh, Pa. (Burton S. Rosenberg, New Haven, Conn., of counsel), for defendants-appellees.

Before VAN GRAAFEILAND,
MESKILL and WALKER, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Leed Architectural Products, Inc. appeals from a summary judgment of the United States District Court for the District of Connecticut (Daly, J.) enforcing a 1988 arbitration award in a labor grievance proceeding. We reverse.

Leed is a Connecticut corporation with its principal place of business in Hamden, Connecticut. At the time of the award at issue, Local 6674 of the United Steelworkers of America was the bargaining representative of the production and maintenance employees at the company's Hamden plant. Under Article VI, Section 1(f) of the collective bargaining agreement between the company and the union, wage rates and ranges were governed by a schedule which provided in part that Fabricator A employees would earn between $8.27 and $8.58 per hour. The agreement also provided that employees receiving more than the maximum of the rate in any category or classification would be considered to have a "red-circle" rate. Article VI, Section 1(g).

On September 30, 1987 Leed hired a welder, Hugh Richards, as a Fabricator A employee. Because Richards had to move from New York to Connecticut to accept the position, Leed agreed to pay him $10 per hour. On February 18, 1988, at the union's request, Leed provided the union with a list of employees and their wage rates. The union then discovered that Leed was paying Richards above the scheduled rate.

On March 22, 1988, the union filed a grievance on behalf of four Fabricator A employees who were earning less than Richards. The grievance alleged that the company had violated the collective bargaining agreement's recognition clause, in which the company recognized the union as the exclusive representative of the production and maintenance employees for the purpose of collective bargaining with respect to pay, hours of work and other conditions of employment. The grievance requested that Leed "[m]ake [the] grievants whole for all monies and benefits lost retroactive to September 30, 1987." Leed denied the grievance, and the dispute was submitted to arbitration.

Article XV of the collective bargaining agreement provided that the agreement constituted the sole, only and entire agreement between the parties in respect to rates of pay and that it could not be changed or modified in any particular whatever by any employee or representative of either party, unless such change or modification should first be reduced to writing and signed by the officers of both parties authorized to do so. Article XI, Section 4 of the agreement provided that the arbitrator had no authority to add to, subtract from or in any way modify its terms, and that the decision of the arbitrator should be final and binding provided it was not contrary to law or the provisions of the agreement.

The arbitrator heard the dispute on October 25, 1988 and issued his opinion on December 15, 1988. He rejected the company's contentions that one of the grievants had not signed the grievance, that the grievance was not timely filed, and that the company was entitled to pay Richards a "red-circle" wage. He did not exceed his authority in so holding. However, when he set about to fashion a remedy, he did exceed his authority. Because the arbitrator's reasoning concerning Richards' wage increase is illustrative of the infirmity in his remedy, it merits discussion.

Leed's principal argument before the arbitrator was that Richards' rate was a red-circle rate which was justified by a past practice between the company and the union. In rejecting this argument, the arbitrator pointed out that the "contract contained a specific provision, Article XV, Amendments, a zipper clause, which expressly excluded reliance on such unwritten agreements, even if they existed." He continued:

The "sword" of Article XI, section 4, restraining me from adding to or subtracting from the contract, cuts both ways. If I were to find a past practice whereby the Company was empowered

to apply red circle rates at its pleasure, it would be in direct contravention of Article XV, and beyond the power given to me by the parties.

The arbitrator then endorsed another argument against legitimatizing the $10 rate:

> The Union also makes another, more sweeping point, that such unilateral action by the Company strikes at the very heart of the collective bargaining process. Here, the parties negotiated over a fairly long period of time to, as the Union representation put it, "hammer out" an agreement. During the course of those negotiations the Union attempted to have the Company raise the wage rates, citing as at least one argument the ability to attract a higher type of worker, but to no avail. What I do not understand is how the Company can justify such a bargaining position when, while one of its supervisory personnel was sitting down across a bargaining table from a Union representative arguing to keep wage rates down, another, *at the very same time*, was negotiating with Richards for a rate of $1.73 higher than existing employees were getting. (emphasis in original)

The arbitrator then concluded that "the Company, having established the rate of $10.00 an hour on September 30, 1987, for the pay grouping which includes welders, fabricator A's and brake operators, cannot now argue that the position is not worth that much. In legal terms, the company is estopped from doing so."

Although our review of the district court's grant of summary judgment is plenary, *Potenze v. New York Shipping Ass'n*, 804 F.2d 235, 239 (2d Cir.1986), *cert. denied*, 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 528 (1987), the scope of our review of an arbitration award is limited. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 369, 98 L.Ed.2d 286 (1987). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not

suffice to overturn his decision." *Id.* at 38, 108 S.Ct. at 371.

This great deference, however, is not the equivalent of a grant of limitless power. *Georgia–Pacific Corp. v. Local 27, United Paperworkers Int'l Union*, 864 F.2d 940, 944 (1st Cir.1988). An arbitrator's authority to settle disputes under a collective bargaining agreement is contractual in nature, and is limited to the powers that the agreement confers. *Torrington Co. v. Metal Prods. Workers Union Local 1645*, 362 F.2d 677, 680 & n. 5 (2d Cir.1966). He may not shield an "outlandish disposition of a grievance" from judicial review "simply by making the right noises—noises of contract interpretation." *In re Marine Pollution Serv., Inc.*, 857 F.2d 91, 94 (2d Cir.1988) (quoting *Ethyl Corp. v. United Steelworkers of Am.*, 768 F.2d 180, 187 (7th Cir.1985), *cert. denied*, 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 300 (1986)). Likewise, he may not "dispense his own brand of industrial justice." *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).

This rule applies not only to the arbitrator's substantive findings, but also to his choice of remedies. "He may not impose a remedy which directly contradicts the express language of the collective bargaining agreement." *Bruno's, Inc. v. United Food and Commercial Workers Int'l Union, Local 1657*, 858 F.2d 1529, 1531 (11th Cir.1988); *see Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n, Associated Maritime Officers*, 889 F.2d 599, 602–04 (5th Cir.1989); *S.D. Warren Co. v. United Paperworkers' Int'l Union, Local 1069*, 845 F.2d 3, 7–8 (1st Cir.), *cert. denied*, 488 U.S. 992, 109 S.Ct. 555, 102 L.Ed.2d 582 (1988). Unless authorized to do so, he should not establish a wage rate that has not been "hammered out at the bargaining table." *Carey v. General Elec. Co.*, 315 F.2d 499, 507 (2d Cir.1963), *cert. denied*, 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed.2d 179 (1964).

Congress has seen fit to require that employers and the representatives of their employees bargain concerning the employ-

ees' wages. *See* 29 U.S.C. §§ 158(d) and 159(a). Moreover, such bargaining must be conducted on a collective basis. "Once an exclusive representative has been selected, the individual employee is forbidden by federal law from negotiating directly with the employer absent the representative's consent." *Wood v. National Basketball Ass'n,* 809 F.2d 954, 959 (2d Cir.1987) (citing *NLRB v. Allis–Chalmers Mfg. Co.,* 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967)); *see NLRB v. Ralph Printing & Lithographing Co.,* 433 F.2d 1058, 1062 (8th Cir.1970), *cert. denied,* 401 U.S. 925, 91 S.Ct. 883, 27 L.Ed.2d 829 (1971).

The arbitrator's decision that Leed violated its collective bargaining agreement in unilaterally deciding to pay Richards $10 an hour does not necessarily mean that the company was guilty of an unfair labor practice; it does mean, however, that Leed violated not only the contract but also the National Labor Relations Act. *See NLRB v. Katz,* 369 U.S. 736, 744, 82 S.Ct. 1107, 1112, 8 L.Ed.2d 230 (1962). The same would be true if the company unilaterally raised the wages of any of the grievants. *See* 29 U.S.C. § 158(d). Having found such violation in the case of Richards, the arbitrator disregarded both the contract and the law by in effect ratifying and perpetuating the company's wrongful act so as to "estop" it from refusing to pay the grievants the same unlawfully arrived at rate. In so doing, the arbitrator overlooked the ancient maxim that two wrongs do not make a right and that estoppel should not become the means of avoiding the requirements of the law, *see Pittsburgh, Cincinnati, Chicago & St. Louis Ry. v. Fink,* 250 U.S. 577, 583, 40 S.Ct. 27, 28, 63 L.Ed. 1151 (1919); *Employer–Teamsters Joint Council No. 84, Health and Welfare Fund v. Weatherall Concrete, Inc.,* 468 F.Supp. 1167, 1169–70 (S.D.W.Va. 1979). There can be no dispute but that wages are the subject of mandatory bargaining. *NLRB v. Wooster Div. of Borg–Warner Corp.,* 356 U.S. 342, 348–49, 78 S.Ct. 718, 722–23, 2 L.Ed.2d 823 (1958). The wages of the four grievants had been established lawfully in this manner. Ac-

cordingly, they suffered no monetary loss as a result of the unlawful payments to Richards. *See Westinghouse Elec. Corp., Aerospace Div. v. International Bhd. of Elec. Workers, Local Union No. 1805,* 561 F.2d 521, 523 (4th Cir.1977), *cert. denied,* 434 U.S. 1036, 98 S.Ct. 771, 54 L.Ed.2d 783 (1978). Richards' wages were not established pursuant to the collective bargaining agreement. Having found this to be so, the arbitrator exceeded his authority in permitting Richards' unlawful wage rate to stand and altering the bargained for and lawful rate of the grievants so as to match it.

"An arbitrator's power is both derived from, and limited by, the collective-bargaining agreement." *Barrentine v. Arkansas–Best Freight Sys., Inc.,* 450 U.S. 728, 744, 101 S.Ct. 1437, 1446, 67 L.Ed.2d 641 (1981). He is "confined to interpretation and application of the collective-bargaining agreement; he does not sit to dispense his own brand of industrial justice." *United Steelworkers of Am. v. Enterprise Wheel & Car Corp., supra,* 363 U.S. at 597, 80 S.Ct. at 1361. The "zipper clause" in Leed's collective bargaining agreement which denies the arbitrator the right to "add to, subtract from or any way modify" its terms, is a pragmatic restatement of the above holdings. Its purpose is "to make the written contract the exclusive statement of the parties' rights and obligations." *International Union, United Auto., Aerospace and Agricultural Implement Workers of Am. v. NLRB,* 765 F.2d 175, 180 n. 21 (D.C.Cir.1985) (quoting R. Gorman, *Basic Text on Labor Law* 471 (1976)).

Although courts usually are reluctant to prohibit arbitration before it takes place because of the difficulty in predicting what the arbitrator will do, *see Carey v. General Elec. Co., supra,* 315 F.2d at 504–08, this uncertainty is eliminated once the arbitrator has made his award. If the reviewing court then determines that the arbitrator has derived his authority from sources outside the collective bargaining agreement, his award cannot stand. *Torrington Co. v. Metal Prods. Workers Un-*

*ion Local 1645, supra,* 362 F.2d at 680. *See Georgia–Pacific Corp. v. Local 27, United Paperworkers Int'l Union, supra,* 864 F.2d at 946 (1st Cir.1988); *Pennsylvania Power Co. v. Local Union # 272 of the Int'l Bhd. of Elec. Workers,* 886 F.2d 46, 48 (3d Cir.1989); *Monongahela Power Co. v. Local No. 2332, Int'l Bhd. of Elec. Workers and Local No. 2357,* 566 F.2d 1196, 1198–99 (4th Cir.1976); *Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n, Associated Maritime Officers, supra,* 889 F.2d at 602 (5th Cir. 1989); *Amanda Bent Bolt Co. v. International Union, United Auto., Aerospace, Agricultural Implement Workers of Am., Local 1549,* 451 F.2d 1277, 1280 (6th Cir. 1971); *International Union of Operating Eng'rs, Local No. 670 v. Kerr–McGee Refining Corp.,* 618 F.2d 657, 660 (10th Cir. 1980).

The arbitrator in the instant case violated this well-established rule when, in violation of both the law and the collective bargaining agreement, he ordered that the bargained for wages of the four grievants should be increased. His decision therefore cannot stand.

Reversed and remanded to the district court with instructions to vacate the award.